IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KIMBERLY HANENBERGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** 14-cv-10-CJP[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kimberly Hanenberger is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for benefits on November 10, 2008, alleging disability beginning on October 10, 2007. (Tr. 11). Plaintiff initially failed to appear for her scheduled hearing in May 2011. (Tr. 32). ALJ Muldoon issued an order of dismissal finding she had not shown good cause for her failure to appear. (Tr. 66-

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 14.

67).   Plaintiff sought review and the Appeals Council remanded the case for a hearing before the ALJ. (Tr. 69-70).

After holding an evidentiary hearing, ALJ Muldoon denied the application for benefits in a decision dated August 13, 2012. (Tr. 11-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in determining RFC by failing to find additional limitations, improperly formulating the RFC, improperly rejecting expert opinions, and by failing to give sufficient explanation in support of the determination.

2. The ALJ failed to properly evaluate plaintiff's credibility.

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C.**

**§423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*,

**573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).**   *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).  This

Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Muldoon followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the date of her application. He found that plaintiff had severe impairments of bilateral optic atrophy, high myopia, recurring bouts of cellulitis and folliculitis, probable borderline intellectual functioning, and a history of situational anxiety and depression. The ALJ found that plaintiff had the residual functional capacity to perform work at the light level, with some limitations. The ALJ found that plaintiff was able to perform her past relevant work as a daycare facility worker. (Tr. 11-20).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

## 1. Agency Forms

Plaintiff was born in 1973 and was thirty-three years old on the alleged onset date of October 10, 2007. She was insured for DIB through December 31, 2012. (Tr. 289). She was enrolled in special education classes and completed high school as well as an associate degree in childcare. (Tr. 261).

According to plaintiff, her vision problems, anxiety, and depression limited her ability to work. (Tr. 257). She previously worked in a daycare and was a dishwasher in a restaurant. (Tr. 258). She claimed that she stopped working because her eyes became so bad that she was unable to watch things as closely as needed. (Tr. 257).

Plaintiff submitted Function Reports in February and November 2008, and February 2009. (Tr. 263-72, 316-24, 338-48). Plaintiff reported that she helped care for her daughter daily, paid bills, grocery shopped, and prepared simple meals. (Tr. 263, 316, 339). She could not mow the lawn but was able to perform most chores in an average amount of time. (Tr. 265, 341). She stated she was able to walk or drive to get most places as long as they were familiar. (Tr. 266, 342). Plaintiff's mother helped her care for her daughter. (Tr. 264).

Plaintiff regularly attended church, counseling, and took her daughter to school. However, she was not allowed to be alone with her daughter so someone

6

always accompanied her. (Tr. 267, 343). She claimed she had difficulties talking, seeing, lifting, reaching, and using her hands as they locked up or hurt when she completed tasks. She stated she could walk one half of a mile at a time and could pay attention for an hour. (Tr. 268, 321, 344). She reported that she was taking an anger management class to help deal with stress. (Tr. 269).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on May 8, 2012. (Tr. 40). She was thirty-nine years old, five feet tall, and weighed one hundred and ten pounds. (Tr. 41).

Plaintiff was single and had two daughters, aged three and seven. Her oldest daughter lived with her, but her younger daughter lived with her brother because the state removed her from plaintiff's home. Plaintiff claimed her daughter was removed from her home because she had a skin illness she could not heal from while living with plaintiff. (Tr. 42). She stated that social workers came to her home to determine her eligibility for keeping her youngest daughter with her, but it was "too cluttered" for plaintiff to regain custody. (Tr. 53).

Plaintiff received child support, had food stamps, and used a medical card. She had a driver's license but could only drive small distances. (Tr. 43). She stated that she had depression, anxiety, nerve problems like fibromyalgia, and poor vision. (Tr. 44-45). She preferred not to drive because her poor vision made her anxious. (Tr. 45). She used a prescribed electronic magnifying glass for reading. (Tr. 46).

Plaintiff completed her associate degree in applied science in early childhood but it took her longer than normal to complete. (Tr. 44). In the past fifteen years, plaintiff testified that she worked as a dishwasher and in daycare. (Tr. 53). She primarily held jobs in the childcare industry, but in 2007 she was accused of harming a child and stopped working. (Tr. 44). Plaintiff also testified that she did very little actual work when she had a job, as other people usually performed her jobs for her. She felt that she was hired because of her associate degree but other people were better at completing the work. (Tr. 53).

A vocational expert did not testify.

### 3. Medical Treatment

In October 2007, plaintiff received counseling at Community Resource Center for anxiety. Plaintiff was anxious because she was being charged with battery of a child that was in her care. The department of children and family services had taken her daughter and closed her daycare as a result. (Tr. 477-78).  One of plaintiff's primary care physicians, Dr. Alberto Butalid, noted that plaintiff went to the emergency room for stress related to these issues in November 2011. He prescribed anxiety medications which he changed the next month because they made plaintiff feel "loopy." (Tr. 528-33).

Plaintiff continued to receive counseling services at Community Resource Center from October 2007 through January 2012. (Tr. 418-70, 595-610, 637-785, 1249-68, 1293-1349, 1402-20). At Community Resource Center, plaintiff typically saw therapist Jean Nosbish for group and individual counseling. Plaintiff

reported feeling anxious and depressed often. (Ex., Tr. 602, 638, 648, 656). She normally worked on issues with anger and communication. (Ex., Tr. 426, 464, 639, 657). Plaintiff reported that she was looking for employment but having trouble due to her legal problems. (Tr. 597, 609). Throughout the course of her treatment, Ms. Nosbish frequently noted that plaintiff was doing better with counseling, her medications were helping, and that she was having less anxiety as a result. (Ex, Tr. 444, 604-09, 646, 711, 1402-8). While in counseling plaintiff's GAF[2] score primarily ranged from 55 to 68. (Ex., Tr. 418, 625, 659, 695, 754, 1300). However, her GAF score rarely fell below 60 after 2009. (Tr. 691, 1298, 1299, 1315).

In 2008, Plaintiff also saw Dr. Stephen Katz, M.D., at St. Mary's Good Samaritan for her anxiety and depression. Dr. Katz noted that plaintiff had lost her job and custody of her daughter due to the battery allegations. He initially diagnosed her with generalized anxiety disorder, a history of panic attacks that were under control, and a GAF score of 50. (Tr. 563-65). He changed plaintiff's medications and she reported that she was doing well, the medicines were helping, and she had no side effects. Plaintiff had to serve some jail time due to the battery charge, but she did "not seem terribly distraught." (Tr. 560).

---

[2] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

In 2009 Dr. Katz left St. Mary's and plaintiff began seeing Dr. Patricia Kinne, M.D., for treatment until 2010. (Tr. 880-911). Dr. Kinne diagnosed plaintiff with PTSD, generalized anxiety disorder, learning disorder NOS, major depressive disorder, and mental retardation NOS with a GAF score of 55. (Tr. 910, 883). Plaintiff reported recurrent anxiety and Dr. Kinne prescribed plaintiff several medications to help cope with symptoms. (Tr. 885). Plaintiff initially reported feeling drowsy on one of the medications, but after it was changed she reported no further side effects. (Tr. 899, 891, 885, 880). Dr. Kinne's final examination notes show that plaintiff's anxiety was "fine" and she wished to remain on her current medications. (Tr. 880).

From 2010 through 2011 plaintiff saw nurse Mary DeClue at St. Mary's. (Tr. 872-879). Plaintiff reported feeling stressed about being unable to see her daughters. Her medications helped her deal with panic and anxiety and nurse DeClue felt plaintiff's behavior and mood were normal. (Tr. 874). She noted that plaintiff had been in therapy for twelve years and had no recent changes in her medical history. (Tr. 1438). In 2011 plaintiff also saw Dr. Niranjan Shrestha, M.D., at St. Mary's. (Tr. 1350-70). Dr. Shrestha primarily treated plaintiff for cellulitis and skin lesions, though he sometimes assessed her anxiety and depression. Dr. Shrestha suggested plaintiff should get regular exercise and prescribed several medications for her skin problems. (Tr. 1350-70).

Plaintiff also had a history of vision problems. Plaintiff's visual acuity was measured between 20/50 and 20/70 throughout her treatment history and she

was diagnosed with high myopia, optic atrophy and mild exotropia. (Tr. 549, 628, 866, 1150-53, 1286). Plaintiff used various forms of visual aids to help her cope with her vision problems. (Tr. 1286).

### 4. Opinions of Treating Therapist and Physician

In February 2011, plaintiff's therapist, Jean Nosbish, completed a mental medical source statement. (Tr. 868-71). She felt plaintiff had marked limitations in her ability cope with normal stress, maintain reliability, relate to family, peers, or caregivers, interact with strangers or the general public, accept instructions or respond to criticism, make simple rational decisions, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, and respond to changes in work setting. (Tr. 868-69).

Ms. Nosbish opined that plaintiff was moderately limited in her ability to function independently, behave in an emotionally stable manner, adhere to basic standards of neatness and cleanliness, ask simple questions or request assistance, maintain social acceptable behavior, and sustain an ordinary routine without special supervision. (Tr. 868-69). She felt plaintiff's symptoms would cause her to miss work twice a month. (Tr. 860). Her final diagnoses were generalized anxiety disorder, panic disorder, major depression, social phobia, PTSD, and borderline intellectual functioning. (Tr. 871).

In 2012, Dr. Shrestha completed mental and physical medical source statements. (Tr. 1385-1392). In his physical medical source statement, he opined

plaintiff could sit for two hours, and stand and walk for an hour. (Tr. 1385). Dr. Shrestha felt plaintiff could occasionally lift ten pounds and carry five to ten pounds. Plaintiff had manipulation limitations in both of her hands, as well as problems balancing and stooping. (Tr. 1386). He opined that plaintiff's objective indications of pain were muscle spasms, reduced range of motion, sensory disruption, and motor disruption. Dr. Shrestha felt plaintiff would either miss work or be late to full-time employment three times a month or more. (Tr. 1387).

In the mental medical source statement, Dr. Shrestha felt plaintiff had marked limitations in her ability to cope with normal stress, adhere to basic standards of neatness and cleanliness, accept instructions or respond to criticism, ask simple questions or request assistance, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, and respond to changes in work setting. Dr. Shrestha opined that plaintiff was moderately limited in her ability to behave in an emotionally stable manner, relate to family, peers, or caregivers, maintain socially acceptable behavior, and sustain an ordinary routine without special supervision. (Tr. 1389-90). He also stated that plaintiff could interact appropriately with coworkers or supervisors up to two hours a day, interact with the general public four hours a day, and apply commonsense understanding to carry our simple instructions up to six hours a day. (Tr. 1391).

**5. RFC Assessments**

State agency consultants performed mental and physical RFC assessments based on a review of plaintiff's records.

A mental RFC assessment was performed by Dr. Howard Tin, Psy.D. in May 2008. (Tr. 506-08). Dr. Tin opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and interact appropriately with the general public. (Tr. 506-07). He felt plaintiff should be limited in her interactions with the general public due to her alleged child physical abuse. He also felt plaintiff could respond appropriately to changes in work setting, understand and remember short simple instructions, and was capable of performing simple tasks. (Tr. 508).

In June 2008, the first physical RFC assessment was performed by Dr. Ernst Bone, M.D. (Tr. 517-23). Dr. Bone felt plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and sit, stand, or walk for six hours out of an eight hour workday. (Tr. 517). He noted that plaintiff had visual limitations with near acuity, far acuity, and field of vision. (Tr. 519). Dr. Bone also opined that plaintiff should avoid concentrated exposure to hazards such as machinery or heights. (Tr. 520).

The second physical RFC assessment was performed by Dr. Charles Wabner, M.D., in December 2008. (Tr. 588-94). Dr. Wabner felt plaintiff had no exertional or postural limitations. (Tr. 588). Based on an eye exam in September 2008, he

felt plaintiff had limitations with far acuity. (Tr. 590). Dr. Wabner also opined that plaintiff should avoid concentrated exposure to hazards such as machinery or heights. (Tr. 591).

**6. Consultative Examinations**

Plaintiff had several consultative examinations throughout the course of her treatment. Her first psychological consultation was performed in April 2008 by Harry Deppe, Ph.D. (Tr. 481-85). Plaintiff reported to Dr. Deppe that she was enrolled in special education classes in grade school due to her vision problems. (Tr. 481). She was receiving outpatient counseling services and anger management treatment as part of a court order. (Tr. 482). After examining the plaintiff for forty minutes, Dr. Deppe felt plaintiff's fund of general information and memory were good. He also opined that her judgment and insight appeared adequate. He diagnosed plaintiff with adjustment disorder with anxious mood, personality disorder NOS, and a GAF score of 65. (Tr. 484).

In March 2011, plaintiff had an additional psychological evaluation performed by Dr. Timothy Leonberger, Ph.D. (Tr. 1269-75). Dr. Leonberger gave plaintiff a WAIS-IV IQ test and determined her full scale score to be 71. (Tr. 1272-73). This placed her on the borderline range of functioning. Measures of her psychomotor speed and information processing were consistently in the extremely low range. (Tr. 1273). His diagnoses were dysthymic disorder, generalized anxiety disorder, borderline intellectual functioning, vision problems, and motor and coordination weakness. He assessed plaintiff was a GAF score of 50. Dr. Leonberger felt

plaintiff had a mild impairment in her activities of daily living and marked limitations in her social functioning, concentration, persistence and pace, and deterioration or decompensation in work or work-like settings. (Tr. 1274).

Dr. Leonberger also filled out a medical source statement in April 2011, where he opined plaintiff could carry out simple instructions for four hours a day, interact appropriately with coworkers and supervisors for up to two hours a day, and interact with the general public for four hours a day. Dr. Leonberger felt plaintiff would be absent or late to work three times a month or more. (Tr. 1278).

Plaintiff's first physical consultative examination was performed in April 2008 by Dr. Raymond Leung, M.D. (Tr. 486-91). Dr. Leung noted that plaintiff had a slightly meandering gait but she was able to walk fifty feet unassisted as well as tandem walk and hop. She had a full range of motion and no muscle atrophy. Dr. Leung stated plaintiff had decreased coordination in her legs. He also felt she was able to manipulate small objects with her hands fairly well. His impressions were muscle weakness and decreased vision.  (Tr. 488).

In September 2008, Dr. Greg Anderson, M.D., performed plaintiff's second physical consultative examination. (Tr. 552-54).  He felt plaintiff had a normal physical examination with no extraordinary findings. (Tr. 554).

Plaintiff had an additional physical consultation performed in April 2009 by Dr. Vittal Chapa, M.D. (Tr. 627-30). Plaintiff had a slightly abnormal finger to nose test with both hands. She also had abnormal heel to shin test with her lower extremities. She did not need ambulatory aids but she walked with a slightly

ataxic gait. Dr. Chapa's diagnostic impressions were a history of optic nerve damage and mild ataxia. (Tr. 629).

In September 2007, plaintiff had a consultative examination performed by ophthalmologist Meenaskshi Desai. (Tr. 510-15). Dr. Desai's impressions were high myopia with marked thin retina in both of plaintiff's eyes, vitreous floaters, and partial amblyopia which explained the visual acuity in both her eyes. (Tr. 510).

## Analysis

Plaintiff first argues that the ALJ erred in assessing her RFC because he should have included additional limitations that are supported by her testimony and by the opinions of her treating doctors. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, **207 F.3d 431, 435 (7th Cir. 2000)**. Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, **395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.** Contrary to plaintiff's

suggestion, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, **688 F.3d 306, 312 (7th Cir. 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, **539 F.3d 473, 483 (7th Cir. 2008).**

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, **556 F.3d 558, 562 (7th Cir. 2009).** It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid.* See also, *Terry v. Astrue*, **580 F.3d 471, 478 (7th Cir., 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, **245 F.3d 881, 887 (7th Cir. 2001).**

The ALJ supported his conclusions with reasons derived from evidence. He pointed out that plaintiff had no regular medical attention or treatment for chronic physical impairments. Her primary physical treatment was for acute medical problems that were treated and resolved. (Tr. 17). The ALJ noted that plaintiff regularly saw counselors at Community Resource Center, but that the

records do not establish plaintiff had diminished ability to think, understand, communicate, concentrate, make judgments, or handle normal work stress over an extended period of time. (Tr. 18). He felt the records from Community Resource Center provided an adequate summary and measurement of plaintiff's mental state, and that most of plaintiff's complaints regarding her mental status related to situational problems such as custody rights to her daughter. Additionally, he stated that there was no documented evidence she had pain interfering with or diminishing her ability to concentrate. (Tr. 17).

Plaintiff claims that the ALJ's credibility analysis was both insufficient and improper. She argues that the ALJ failed to analyze which specific statements plaintiff made were not credible and the extent they were not credible. Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, **688 F.3d 306, 312 (7th Cir. 2012).** Additionally, the ALJ did address how some of plaintiff's statements in her testimony were not credible. Plaintiff testified that someone else typically performed her jobs or they were charity jobs. However, the ALJ felt this was an exaggeration as plaintiff had significant earnings, was gainfully employed for many years, and no other indication that she did not perform her jobs was shown. (Tr. 13, 18). The ALJ opined that plaintiff's testimony that she was significantly restricted in typical physical activities was not supported by the preponderance of medical evidence because she could walk unassisted and, while she had difficulty, she was able to perform fine motor tasks. (Tr. 17).

Plaintiff also claims that the ALJ failed to address her allegations that she had limitations in standing, walking, sitting, and issues with social anxiety. The ALJ made note of these complaints by plaintiff, however, he reasoned that plaintiff had a normal physical examination with Dr. Anderson, and her doctors and treating nurse found her mental impairments to be under control. (Tr. 12-14).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, **573 F.3d 503, 517 (7th Cir. 2009).** ALJ Muldoon's analysis is far from patently wrong. If, as plaintiff suggests, the ALJ had merely stated that a preponderance of the evidence was inconsistent with her allegations and had not gone on further to explain, then his credibility determination could not stand. However, it is evident that he considered the appropriate factors in his analysis and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony. *Castile v. Astrue*, **617 F.3d 923, 929 (7th Cir. 2010).**

The Court then turns to plaintiff's first argument regarding her RFC. Plaintiff contends that the ALJ's RFC analysis was flawed because it was vague and confusing, he failed to include additional limitations supported by the record, he improperly rejected expert opinions, and he failed to provide a sufficient explanation in support.

An RFC is "the most you can still do despite your limitations."  20 C.F.R. §1545(a).  In assessing RFC, the ALJ is required to consider all of the claimant's

"medically determinable impairments and all relevant evidence in the record." *Ibid*. "As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians. **See *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir.1995).** Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

Plaintiff argues that the ALJ's RFC determination was vague and confusing due to his usage of the words "possibly" and "probably." Though, as the Commissioner notes, aside from pointing out these two words plaintiff does not establish how the RFC determination is vague. While the ALJ's verbiage is not as clear as it could be, plaintiff fails to establish how the words "possibly" and "probably" make the RFC vague and confusing.

The ALJ looked at plaintiff's treatment history and noted that she had no surgery or recent inpatient hospitalizations. She was not referred to physical therapy or a pain management clinic. Her record displays minimal side effects from medications. The ALJ created an RFC based upon the record as a whole and when looking at the determination from a "commonsensical" perspective, it is apparent the ALJ limited plaintiff to a light range of work. *Shamrek v. Apfel*, **226 F.3d 809, 811 (7th Cir. 2000).**

Plaintiff then contends that the record provided for a more restrictive RFC than the ALJ presented. She first argues that the limitations and problems she testified to should have been considered in forming her RFC. As discussed above,

the ALJ appropriately did not find plaintiff to be entirely credible and therefore her statements alone are not enough to warrant greater limitations. However, plaintiff also argues that medical opinions that support her claims were improperly weighed.

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, **227 F.3d 863 (7th Cir. 2000);** *Zurawski v. Halter*, **245 F.3d 881 (7th Cir. 2001).**

The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, **91 F.3d 972, 979 (7th Cir. 1996)**(internal citation omitted). It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in

weighing medical opinions. *See*, 20 C.F.R. §404.1527(d). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." **Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. **Henke v. Astrue, 498 Fed.Appx. 636, 639 (7th Cir. 2012); Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).** In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." **Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008); Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008).**

ALJ Muldoon met and exceeded this "lax" standard in his analysis. Plaintiff's argument focuses on the opinions of Dr. Leonberger, Dr. Shrestha, and Ms. Nosbish. She states that the ALJ failed to appropriately analyze the opinions of the medical professionals and did not give enough weight to Ms. Nosbish's or Dr. Leonberger's opinions. First, it is important to note that Ms. Nosbish is a therapist which is not considered an acceptable medical source. *See,* 20 C.F.R. §

404.1527(a)(2). Therefore, her opinion did not constitute a "medical opinion" and cannot be given weight.

The ALJ did look at Ms. Nosbish's opinion, though, as well as the opinions of Dr. Leonberger and Dr. Shrestha and noted their findings. (Tr. 15, 17). He determined they were not credible as valid long-term assessments of plaintiff's mental functioning ability. He referred to her records from Community Resource Center and St. Mary's, where she received treatment for several years, and determined they provided a better longitudinal assessment of her capabilities. He felt that Ms. Nosbish's opinions were not supported by treatment notes within plaintiff's record at St. Mary's and Community Resource Center, as they did not show she had a mental impairment that was serious in degree or uncontrollable. He observed that plaintiff's GAF scores were typically in the low 60s, and she retained the capacity to perform her prior child care job which she lost for non-medical reasons.

The ALJ assessed Dr. Shrestha's opinions. He stated that Dr. Shrestha's records were inconsistent with his opinion that plaintiff was physically disabled, notably suggesting exercise as a treatment option. (Tr. 16-17). Additionally, the ALJ opined that Dr. Shrestha was not a specialist, nor did he regularly manage plaintiff's mental health. Treatment records from mental health professionals that plaintiff regularly saw, like Dr. Katz, Dr. Kinne, or nurse DeClue, indicated she did not have any disorder that would prevent her from performing her past work.

Plaintiff argued that Dr. Leonberger's opinion should be entitled to substantial weight because he was an examining specialist. She also contends that the ALJ failed to use the regulatory factors in weighing Dr. Leonberger's opinion. However, as the Commissioner points out, an ALJ may weigh examining source opinions for supportability, consistency, and with the record as a whole. *See,* 20 C.F.R. § 404.1527(c)(3)-(6). Additionally, the Seventh Circuit has held that an ALJ need not explicitly weigh every factor when deciding to reject a medical opinion and discussing only two of the factors may be sufficient. ***Henke v. Astrue*, 498 Fed.Appx. 636, 640 (7th Cir. 2012),** *Elder v. Astrue***, 529 F.3d 408, 413 (7th Cir. 2008).** Here, the ALJ looked at plaintiff's entire medical history and reasoned that her treatment history was inconsistent with Dr. Leonberger's opinion. Dr. Leonberger only saw the plaintiff once for a consultative examination and there was little medical evidence in support of his opinion. The lack of support, inconsistency with the record, and the short-term nature of the relationship was enough for the ALJ to correctly give the opinion less weight.

Plaintiff restated portions of her medical record where anxiety and panic disorder were noted. She discusses how Dr. Katz made a note that plaintiff appeared to be anxious and gave her a GAF score of 50. Additionally, she states that Dr. Kinne noted plaintiff was anxious and had side effects from her medications. She argues that the ALJ focused on the portions of the record where plaintiff's GAF score was above 60 and did not address the records showing plaintiff had serious anxiety. Plaintiff's arguments are unavailing.

The ALJ discussed much of plaintiff's treatment history within his opinion. He looked at her repeated visits to counseling and St. Mary's for anxiety and panic. (Tr. 14-18). He noted that she went to therapy regularly and the records indicated she generally did well especially when she took her medications. (Tr. 14). The ALJ stated that plaintiff did have side effects from her medications occasionally, but that they were either eliminated or greatly diminished by changes the medical professionals made. (Tr. 17). The ALJ acknowledged that plaintiff had borderline mental functioning, but noted that she completed a program for an associate degree and had the intellectual capacity to hold several jobs in the past. (Tr. 17). Plaintiff never required psychiatric hospitalization and had no credible, medically-established mental or mood disorder that precluded her from her prior work. (Tr. 18).

Additionally, the Seventh Circuit has stated that while GAF scores may be useful for measuring the severity of symptoms and functional level, "the score does not necessarily reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, **596 F.3d 419, 425 (7th Cir. 2010).** The Commissioner correctly notes that an ALJ does not have to assess work related capacity based on a GAF score. The ALJ here acknowledged that plaintiff occasionally had lower GAF scores, but that after 2009 most of her treatment notes were positive. (Tr. 15).

In sum, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the

Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, **688 F.3d 306, 310 (7th Cir. 2012)**; *Elder*, **529 F.3d 413.** ALJ Muldoon's decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Muldoon committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Kimberly Hanenberger's application for disability benefits is **AFFIRMED.**

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE: January 16, 2014.**

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**